**UNITED STATES of America, Plaintiff,**

v.

**Paul GOODE, Defendant.**

No. 90–1247–C.

United States District Court,
D. Kansas.

Dec. 17, 1991.

Stephen K. Lester, U.S. Attorney's Office, Wichita, Kan., for plaintiff.

Calvin L. McMillan, Kaplan & McMillan, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the plaintiff's motion for summary judgment. The United States brings this action on behalf of the Commodity Credit Corporation to recover certain payments made to a dairy farmer, Paul Goode, pursuant to the Milk Diversion Program created by the Dairy and Tobacco Adjustment Act of 1983, 7 U.S.C. § 1446(d). The United States al-

leges Goode violated the terms of his participation contract by transferring certain dairy cattle, which would or could have been used by Goode to produce milk, to another farm operated by his sons where the cattle were milked and their produce marketed separately. Goode denies that production from his sons' cattle was ever included in his dairy "unit" for purposes of calculating his base production. Goode also asserts that he relied on the advice of the Agriculture Stabilization and Conservation Service (ASCS) in moving his sons' cows to another farm. The United States seeks to recover those payments for which Goode was not entitled to receive, and Goode counterclaims for payments withheld under the contract.

The United States seeks summary judgment on these three issues now articulated by the court.[1] Is the United States entitled to recover certain payments as a matter of law because the defendant included Larry Goode's cows in defendant's base of production and then later permitted Larry Goode to remove his cows and to sell the milk produced from them separately? Assuming these actions of defendant Goode did not violate the contract nor frustrate the intent behind the Milk Diversion Program, does the Tucker Act, 28 U.S.C. § 1346(a)(2), preclude this court from hearing the defendant's counterclaim as it exceeds $10,000? May the defendant assert estoppel against the United States as a result of his reliance on the mistaken advice given by a local agent with the ASCS office?

A motion for summary judgment gives the judge an initial opportunity to assess the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially,

---

1. The court refers the plaintiff's counsel to D.Kan. Rule 112, which requires all briefs and memoranda to set forth a statement of the question or questions presented. Compliance with this requirement would minimize the chances for confusion over what issues are being presented for the court to decide.

the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. 477 U.S. at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.*, 896 F.2d 474, 476–77 (10th Cir.1990).

The movant's initial burden under Fed.R.Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 345 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of "'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,'" which demonstrate the absence of a genuine issue of fact. *Windon*, 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon*, 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

For purposes of this motion, the court will accept the following facts as uncontroverted:

1. The Commodity Credit Corporation ("CCC") is an agent and instrumentality of the United States within the Department of Agriculture, created for the purpose of stabilizing, supporting and protecting farm income and prices, assisting in the maintenance of balanced and adequate supplies of agricultural commodities and facilitating the orderly distribution of such commodities. 15 U.S.C. § 714.

2. The ASCS is an agency of the Department of Agriculture that administers commodity programs designed to adjust, support and stabilize farm production and income.

3. The Congress enacted the Dairy and Tobacco Adjustment Act of 1983, and within it, the Milk Diversion Program, to reduce the production of milk by having milk producers agree to reduce their production levels by a certain percentage.

4. The defendant Paul Goode on January 27, 1984 signed a contract to participate in the Milk Diversion Program. The CCC accepted his contract. Among its relevant terms, the contract established Goode's base of production by quarters for the period running from January of 1984 through March of 1985 and Goode's projected levels for reducing production by 27%. In exchange for Goode's reduced production, the CCC agreed to make quarterly payments to him of $.10 a pound of the reduction as calculated from the relevant contract provisions.

5. As to transfers or sale of dairy cattle, the contract provided:

A. The producer shall be ineligible for payments under the contract if there has been, after the date on which the offer to enter into the contract was submitted, a sale, lease, or other transfer of any dairy cows which were included in the unit *and* would or could have been used by the producer for the

production of milk if the producer had not executed this contract unless:

(1) The sale, lease or other transfer of the producer's dairy cows is made to another producer who has executed a contract on Form CCC–150 with CCC;

(2) The producer sells the dairy cows for slaughter; or

(3) The dairy cows are sold and delivered for export and do not reenter the United States.

(emphasis supplied).

6. As to any misrepresentation or unauthorized practices, the contract reads:

A. If CCC determines that the producer has erroneously represented *any fact* or has adopted or *participated in any practice which tends to defeat the purpose of the program,* the producer shall be ineligible for payments under the contract and shall refund to CCC all payments received by the producer under the contract together with interest as prescribed in paragraph 14A of the appendix.

(emphasis supplied).

7. The contract also requires the producer to refund any payments with interest which the CCC would not have made but for a scheme or device employed by the producer for that purpose.

8. As part of the program, Paul Goode signed a Milk Reduction Plan whereon he indicated that during the 15–month program period he would cut back his herd by selling 24 dairy cattle in addition to the 4 head that he would sell due to normal culling. In his Plan, Paul Goode also represented the average number of dairy cows that he milked in 1983.

9. In establishing Paul Goode's base of production from which the reduction was calculated, the parties used the average of Goode's milk production for the years of 1981 and 1982. This base of milk production was prepared and dated on January 27, 1984.

10. Paul Goode has two sons, Larry and Edward. For some period, Larry owned and kept some dairy cows at his farmer's dairy. (While both parties cite to Larry Goode's deposition, neither party has submitted the relevant portions from that deposition as required by D.Kan. Rule 206(c). Without the deposition, the court cannot resolve what appears to be conflicting summaries of Larry Goode's deposition testimony. For this reason, the court has no choice but to find the facts controverted as to if or when Larry Goode had any producing dairy cattle on his father's farm that were or could have been included in his father's production "unit." [2])

11. In early 1984, Edward Goode had four dairy cattle that began producing milk. They were milked at his father's dairy farm, and the milk was sold by his father.

12. Concerned that the milking of his son's cows at his dairy farm was in conflict with the Milk Diversion Program, Paul Goode contacted the ASCS office. Marvin Turner, the ASCS officer, told him that his son's cows would have to be removed from his farm. Marvin Turner does not recall giving this advice to Paul Goode.

13. In April of 1984, Larry and Edward Goode rented 300 acres in Kingman County, Kansas, and moved their dairy cows from their father's farm to this location.

14. Paul Goode submitted applications for five quarterly payments. Each application compared the milk marketed against the base period and calculated the amount

**2.** At this point, the court must confess it is confused by the United States' construction of the participation contract and the facts offered to show a breach of it. The critical clause in the contract makes a producer ineligible, subject to three exceptions, for transferring a dairy cow which was included in the "unit" and was or could have been used for the production of milk if the contract had not been executed. "Unit" is defined by the contract as "the dairy cows, milk production facilities, and land used to produce

milk which are identified on Form ASCS–142 and approved by the County Committee." Paul Goode completed Form ASCS–142 using his production totals for the years of 1981 and 1982. Consequently, it appears the critical questions are whether any of the dairy cattle owned by Paul Goode's sons were producing milk during the years of 1981 and 1982 at Paul Goode's dairy farm and whether this production was included in Paul Goode's base. None of the facts presented are determinative of these questions.

of the program payment. The ASCS withheld payments for the fourth and fifth quarters believing Paul Goode had violated the terms of the contract.

## DEFENDANT'S ALLEGED VIOLATION OF CONTRACT

█ The United States contends Paul Goode violated the express terms of the contract and contravened the purpose of the program by including Larry's dairy cows in his base of production and then permitting the cattle to be removed and produced outside the control of the program. The court summarily denies this contention as the plaintiff has wholly failed to show that Paul Goode included his son's cows in his base of production as established from his production history for the years of 1981 and 1982.

## TUCKER ACT

█ The United States argues the defendant's counterclaim is subject to the Tucker Act, 28 U.S.C. § 1346(a)(2), which reads in pertinent part: "The district courts shall have jurisdiction, concurrent with the United States Claims Court, of ... [a]ny other civil action or claim against the United States, not exceeding $10,000 in amount founded either upon the Constitution, or any Act of Congress or any regulation of any executive department, or upon any express or implied contract with the United States." In other words, the Tucker Act creates concurrent jurisdiction between the district court and the Claims Court for money claims against the United States involving amounts less than $10,000 and establishes exclusive jurisdiction with the Claims Court for monetary damages greater than $10,000. *Colorado Dept. of Highways v. U.S. Dept. of Transp.*, 840 F.2d 753, 755 (10th Cir.1988).[3] In opposition to the United States' motion, defendant insists the district court has jurisdiction of his counterclaim because he is seeking judicial review of the arbitrary and capricious actions of the ASCS and a determination of

his eligibility under the diversion program. Defendant principally relies on the decision of *Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672 (D.Kan.1991).

The Government argues the Tucker Act is a limitation on this court's authority to hear Goode's counterclaim whether jurisdiction is based on the general grant provision in the CCC Charter Act, 15 U.S.C. § 714b(c), or based on another provision, such as the federal question statute, 28 U.S.C. § 1331. In adopting the analysis from the *Olenhouse* decision, Paul Goode counters that jurisdiction is available under the federal question statute, *see, Adamson v. Radosevic*, 685 F.Supp. 814, 181 (D.Kan. 1988), and that the waiver of sovereign immunity is found within the terms of the Administrative Procedures Act, 5 U.S.C. §§ 702–703.

In *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), the Supreme Court held that the federal district courts, rather than the Claims Court, had jurisdiction to review a Department of Health and Human Services' ("HHS") order which refused to reimburse a State for certain expenditures under a Medicaid program. The Secretary of HHS argued district court review was not available under the APA, 5 U.S.C. § 702, as the State was not "seeking relief other than money damages." The Court rejected this argument and defined "money damages" consistent with the well-established distinction between compensatory damages and specific relief:

Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with back pay, or for "the recovery of specific property or *monies*, ejectment from land, or injunction either

---

**3.** The Claims Court's jurisdiction is exclusive over these claims only to the extent that Congress has not conferred jurisdiction to other courts on these claims. *Hamilton Stores, Inc. v. Hodel*, 925 F.2d 1272, 1277 n. 11 (10th Cir.1991).

directing or restraining the defendant officer's action." (Citation omitted).

. . . .

. . . The State's suit to enforce § 1396b(a) of the Medicaid Act, which provides that the Secretary "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.

487 U.S. at 893, 900, 108 S.Ct. at 2731–32, 2735 (emphasis in original).

The Court in *Bowen* also rejected the Secretary's argument that § 704 of the APA barred judicial review as an alternative adequate remedy in the form of monetary relief was available against the United States in the Claims Court under the Tucker Act. The Court reasoned that the remedy in Claims Court was not the type of review procedure intended to supplant the district court's jurisdiction under the APA. 487 U.S. at 904, 108 S.Ct. at 2737. The Court also recognized the need for the district court to enter declaratory or injunctive relief where the agency action under review involved interpretation of its regulations governing an ongoing relationship. 487 U.S. at 905, 108 S.Ct. at 2737. Such equitable relief is not available in the Claims Court. *Id.*

In *Olenhouse*, Judge Theis closely followed the holding in *Bowen*. He first found that the plaintiff farmers were not seeking money damages, but an injunction against the CCC precluding any reduction in their deficiency payments and any setoff of their advance payments. 136 F.R.D. at 677. He then looked behind the claims to determine if they were intended to obtain money damages from the government. He concluded that the farmers, rather than asking for money as compensation for some injury resulting from the breach of the contract or as a substitution for a loss under the contract, were asking for specific relief through the enforcement of the statutory mandate on the Secretary to make

payments to the producer. *Id.* The statutory mandate of a federal grant-in-aid program directs the payment of money, not as compensation for a past injury, but to subsidize future expenditures. *Bowen*, 487 U.S. at 905 n. 42, 108 S.Ct. at 2738 n. 42.

As reflected in the pretrial order, Paul Goode requests the court to enforce the statutory mandate of the Dairy and Tobacco Adjustment Act of 1983 by having the plaintiff make the fifth quarter payment due under the contract and by recovering all related setoffs made against his diversion payments due under other CCC programs administered by the ASCS. Paul Goode's counterclaim does not seek compensation for CCC's alleged breach nor asks for money in lieu of the loss under the contract. Paul Goode's counterclaim asks the court to construe and enforce the contract between him and the CCC which is nothing more than a contractual embodiment of the regulations found at 7 C.F.R. § 1430.400 *et seq.* Assuming Goode exhausted his administrative remedies as he asserts, this court would appear to have authority to decide Goode's counterclaim under the APA.

The next question is whether the Tucker Act should foreclose our review of the counterclaim despite the applicability of the APA. The reasons for district court review expressed first in *Bowen* and echoed in *Olenhouse* apply with equal force in the instant case. This court has the authority to offer injunctive relief upon a finding that the regulations, procedures or actions are found to be unconstitutional. The Milk Diversion Program is an involved regulatory scheme addressing an ongoing relationship between the CCC and Paul Goode. Paul Goode's counterclaim will require this court to determine agency compliance with those regulatory provisions incorporated within the contract. The district court's review of administrative actions in such a setting takes precedence over the Claims Court's jurisdiction under the Tucker Act. *Olenhouse*, 136 F.R.D. at 678. Since *Bowen*, most courts have recognized the authority of district courts to review the determinations of the CCC or the ASCS concerning payments or eligibility under agri-

cultural support programs. *See, e.g., Esch v. Yeutter,* 876 F.2d 976 (D.C.Cir.1989); *Kumm v. United States,* No. 90–1280, 1991 WL 255443, 1991 U.S.Dist. LEXIS 16195 (D.D.C. Nov. 12, 1991); *Vanderveld v. Yeutter,* 774 F.Supp. 645 (D.D.C.1991); *Thompson v. Vernon County ASCS Comm.,* No. 89–0735 1990 U.S.Dist. LEXIS 13463 (W.D.Mo. Oct. 9, 1990). This court is unconvinced Paul Goode's counterclaim is of the type that should only be heard by Claims Court. Plaintiff's motion concerning the Tucker Act is denied.

## ESTOPPEL

■ As set forth in the pretrial order, Paul Goode contends that the ASCS mistakenly advised him in February of 1984 that his son's cows could not be milked on his farm when other alternatives known to the ASCS were available and that the ASCS misled him into believing that any conflict problems would be cured once his son's cows were removed from his farm. After discussing the facts and holdings of two recent Supreme Court cases on the issue of estoppel, the United States contends Paul Goode may not assert estoppel merely because he relied upon the erroneous advice of an ASCS agent. Paul Goode responds choosing not to address any of the case law or general rule against imposing estoppel on the government and offering, instead, the following regulation applicable to all Title 7 programs administered by the ASCS:

(a) Notwithstanding any other provision of law, performance rendered in good faith in reliance upon action or advice of any authorized representative of a county committee of State committee as defined in Part 719 of this chapter, may be accepted by the Administrator, ASCS (Executive Vice President, CCC), the Associate Administrator, ASCS (Vice President, CCC), or the Deputy Administrator, State and County Operations, ASCS (Vice President, CCC), as meeting the requirements of the applicable program, and price support may be extended or payment may be made therefor in accordance with such action or advice to the extent it is deemed desirable in order to provide fair and equitable treatment.

(b) The provisions of this part shall be applicable only if a producer relied upon action or advice of a county or State committee or an authorized representative of such committee in rendering performance which the producer believed in good faith met the requirements of the applicable program. The authority provided in this part does not extend to cases where the producer knew or had sufficient reason to know that the action or advice of the committee of its authorized representative upon which he relied was improper or erroneous, or where the producer acted in reliance on his own misunderstanding or misinterpretation of program provisions, notices or advice.

Defendant reads this regulation to bind the plaintiff to the ill advice given by the local ASCS office upon which the plaintiff relied in good faith.

The court construes the defendant's argument as a concession of the general rule precluding estoppel against the government and as an assertion that his reliance defense is solely grounded on 7 C.F.R. § 790.2. The plaintiff has not addressed the applicability or meaning of this provision or the standard governing a district court's review of an agency's decision on the exercise of its authority under § 790.2.[4] For these reasons, the court will grant the United States' motion for summary judgment on the estoppel issue and will reserve the issues surrounding § 790.2 for decision when properly presented to the court.

IT IS THEREFORE ORDERED that the United States' motion for summary judgment (Dk. 11) is denied with the exception that Paul Goode may no longer assert estoppel against the United States other than

---

**4.** The court's cursory review of the case law suggests this regulation gives the agency the discretion to relieve a party from compliance where it would be equitable to do so. The exercise of such discretion would be reviewed under an abuse of discretion or arbitrary and capricious standard. *See National Wildlife Federation v. ASCS,* 941 F.2d 667, 668–69 (8th Cir. 1991); *Golightly v. Yeutter,* 780 F.Supp. 672 (D.Ariz.1991).

to seek review of the agency's exercise of its discretionary authority under 7 C.F.R. § 790.2.